**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

ERIC SORENSON,

<b>COMPLAINT</b>

Plaintiff,

-against-

15 Civ. 04614

SANDRA SIMPSON,

Judge

Defendant.                                                    Magistrate Judge
-------------------------------------------------------------X

**First cause of action**
(Enforcing a retainer agreement)

Plaintiff ERIC SORENSON alleges that:

1. He is a resident of the State of New York and that on information and belief defendant, Sandra Simpson is domiciled in Saxonburg, Pennsylvania.

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1332, since there exists diversity of citizenship between Simpson and I, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

3. Venue is appropriate in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2).

4. I am a lawyer admitted to practice in the courts of the State of New York; I have been admitted to practice in the United States District Courts for the Southern and Eastern Districts of New York from 1999 and 2000 respectively; I was admitted into the D.C District Court from 1999 through 2011.

5.  On or about May 18, 1999, in New York, Simpson retained me to represent her in the litigation (the "Libyan litigation") of claims (the "Libyan claims") against Socialist People's Libyan Arab Jamahiriya ("Libya").

6.  In July 2000, I filed a complaint against Libya on behalf of Simpson in United States (the "D.C. District Court").

7.  Simpson's motion to admit me as her counsel was certified by the D.C. District Court on June 25, 2001.

8.  During the Libyan litigation, I retained experts to support Simpson's claims including medical, psychology, trauma and hostage experts.

9.  In 2001, I successfully defended Libya's first motion to dismiss.

10. After Libya lost its first motion to dismiss, it appealed to the United States Court of Appeals for District of Columbia (the "Court of Appeals").

11. On April 22, 2003, the Court of Appeals affirmed the decision of the D.C. District Court as to a hostage taking claim and remanded to permit Simpson the opportunity to amend her complaint.

12. In 2003, Simpson filed an amended complaint with the D.C. District Court.

13. In December 2003, Libya moved to dismiss the amended complaint and on March 7, 2005, the D.C. District Court denied Libya's motion to dismiss.

14. On April 29, 2005, Libya appealed the D.C. District Court's March 7, 2005, decision.

15. On November 21, 2006, the Court of Appeals affirmed the D.C. District Court's denial of Libya's second motion to dismiss and remanded the action for further proceedings.

16. On March 13, 2007, Libya filed an answer to Simpson's amended complaint and filed a third motion to dismiss was then denied by the D.C. District Court on January, 10, 2008.

17. Pursuant to the August 2008 passage of the "Libyan Claims Resolution Act," (the "LCRA") the Foreign Claims Settlement Commission ("FCSC") was empowered to hear claims in pending litigation against Libya by plaintiffs seeking damages resulting from their being taken hostage.

18. "Pending litigation" was defined as litigation that was "live" at the time of the passage of the LCRA.

19. Pursuant to Articles I and II of the "Claims Settlement Agreement between the United States of America and The Great Socialist People's Libyan Arab Jamahiriya," Simpson was required to terminate her suit against Libya in the District Court in order proceed with the FCSC.

20. On November 19, 2008, Simpson's stipulation of dismissal was approved by the D.C. District Court.

21. In July 2009, I filed the Libyan claims with the FCSC.

22. The 1999 retainer agreement was duly superseded by the "2009 retainer agreement" which provided that, "[i]f I terminate my attorney before a judgement or settlement and that, in fact occurs, I understand I will be liable for all his expenses and a reasonable fee for his services."

23. During the years 2009 through 2011, I supported the Libyan claims by hiring medical and psychiatric experts, collected evidence, and traveled to Washington D.C. to lobby Pennsylvania legislators and the Department of State to encourage a favorable interpretation of the LCRA for Simpson.`

24. In July 2011, Simpson discharged me without cause from representing her in the Libyan litigation.

25. Two weeks after filing a brief on her behalf, I received notice of her discharge from the FCSC rather than from Simpson.

26. Upon information and belief, Simpson retained Winston and Strawn, LLP ("W & S") to replace me long before terminating me.

27. Simpson was aware of the success of my work on her behalf, noting in a July 2012 email to her ex-husband that the 2006 Court of Appeals decision was highly regarded by the United Nations High Commissioner for Refugees ("UNHCR").

28. The July 2012 email stated that, "[many] lawyers viewed [my] work as a win ... the UNHCR being proud of the work [I] did for Simpson's case."

29. In an email dated September 27, 2012 (the "September 27 email"), despite being dismissed without cause, I offered to share my research, notes from experts I hired and other case-related materials with Bravin, a partner at W & S.

30. In the September 27 email, I informed Bravin of my pecuniary interest in the outcome of Simpson's case pursuant to the 1999 and 2009 retainer agreements including the unpaid expenses Simpson owed me.

31. On September 28, 2012, Bravin responded to the September 27 email by stating that he had relied on the previous published decisions of the FCSC in addressing Simpson's claim without acknowledging my contributions.

32. On February 15, 2013, the FCSC awarded Simpson $1,000,000 for her claim.

33. On or about April 25, 2013, I served Simpson with a notice of lien and a letter detailing the work I had done for her and informing her that I going to take action to enforce the lien.

34. Pursuant to the terms of the 1999 and 2009 retainer agreements, Simpson owes me attorney's fees in the amount of up to one-third of the $1,000,000 settlement, and $35,095 in out-of-pocket expenses, plus interest, or, up to $356,730 plus interest.

35. On January 14, 2014, I wrote Bravin and Simpson to ask whether payment of the award had been issued and if W & S was still representing Simpson.

36. On or around January 24, 2014, the U.S. Treasury informed me that a payment of $201,000 had been made to Bravin out of the Simpson award and the remaining $799,000 had been paid to W & S.

37. On January 24, 2014, I emailed Bravin and Simpson to remind them of the notice of lien I had served on them in April 2013.

38. On December 5, 2014, I wrote Simpson to demand the full payment for legal services and expenses totaling $372,579 and included a copy of my attorney's lien.

39. By reason of the forgoing (pursuant to NY CLS Jud. L. § 475) I am entitled to enforcement of my attorney's lien in a judgment ordering:

    a) Payment of Simpson's legal services and out of pocket expenses in the amount of up to $356,730 plus interest, and

    b) Such other relief as shall be just and equitable including attorney's fees.

**Second cause of action**
(breach of fiduciary duty)

40. I repeat and reallege each and every allegation of paragraphs 1 - 38.

41. In New York, a claim for breach of fiduciary duty has three elements:

    a) the existence of a duty on the defendant's part as to the plaintiff,

    b) a breach of this duty, and

    c) injury to the plaintiff as a result of the breach.

42. A client has a fiduciary duty not to utilize an attorney's services without intent to pay for them or to repay the attorney for the client expenses she or he advanced.

43. Simpson took advantage of the services rendered by me to her and the expenses I advanced for her but failed to compensate me for my legal services and to reimburse me for the out of pocket expenses.

44. Simpson breached her duty in failing to duly compensate me for my work on her case and her out of pocket expenses as required by the 1999 and 2009 retainer agreements.

45. I was injured as a result of Simpson's breach in the amount of up to $356,730, plus interest including out of pocket expenses.

46. By reason of the forgoing, I am entitled to judgment granting me:

    a) Payment for my legal services and out of pocket expenses in the amount of up to $356,730 plus interest, and

    b) Such other relief as shall be just and equitable including attorney's fees.

**WHEREFORE**, it is respectfully requested that this Court grant the relief requested in paragraphs 39 and 46.

July 30, 2015

Peter G. Eikenberry (7257)
*Attorney for plaintiff*
*Eric Sorenson*
7 Hanover Square, 8th Floor
New York, New York 10004
T: (212) 385-1050
F: (212) 385-1017
pete@eikenberrylaw.com